J-A15005-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                         :        PENNSYLVANIA
                                          :
           v.                           :
                                          :
RONALD LEE WEISS                 :
                                          :
           Appellant            :    No. 315 WDA 2022

Appeal from the Order Entered June 10, 2021
In the Court of Common Pleas of Indiana County
Criminal Division at CP-32-CR-0000218-1997

BEFORE:   MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.*

MEMORANDUM BY MURRAY, J.:         **FILED: September 27, 2023**

Ronald Lee Weiss (Appellant) appeals from the order denying his motion to dismiss charges based on double jeopardy grounds. After careful consideration, we affirm and remand for the case to proceed to trial.

Most of the underlying facts are not relevant to this appeal. ***See Commonwealth v. Weiss***, 776 A.2d 958, 961-62 (Pa. 2001) (***Weiss I***) (detailing evidence adduced at Appellant's 1997 homicide trial). In 1997, the Commonwealth charged Appellant with the 1979 homicide of 16-year-old Barbara Bruzda (Bruzda). The matter proceeded to a jury trial in July 1997. The Pennsylvania Supreme Court explained:

> Isadore Mihalakis, a forensic pathologist, testified [for the Commonwealth] that Bruzda died of massive skull fractures with associated brain injury, with the manner of her death being

---

* Retired Senior Judge assigned to the Superior Court.

homicide. … Kerm Wright [(Wright)], a [Commonwealth] witness, testified that [while he and Appellant were incarcerated together, Appellant] confessed to him in 1985 that he had killed Bruzda. Samuel Tribuiani [(Tribuiani)] … testified [for the Commonwealth that while he was incarcerated with Appellant] in 1993[, Appellant] confessed to him that he had killed a young girl some years before. [Appellant] testified on his own behalf and denied any involvement in the death of Bruzda.

*Weiss I*, 776 A.2d at 962 (paragraph breaks omitted). The jury convicted Appellant of first-degree murder and sentenced him to death. *Id.* The Pennsylvania Supreme Court affirmed Appellant's conviction and death sentence. *Id.* at 970 (stating, "the evidence presented was sufficient to support the aggravating circumstance found" regarding the jury's sentence of death; namely, Appellant's "significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9)" (addressing aggravating circumstances for first-degree murder where defendant has significant history of felonies involving use or threat of violence)).

This Court described the ensuing procedural history:

Appellant then pursued collateral relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541, *et seq.*, and in 2007, the PCRA court granted Appellant a new trial. The basis for relief was a finding that the Commonwealth, acting through prosecutor J. Scott Robinette, Esquire (hereinafter "Robinette"), committed a **Brady** violation, **see Brady v. Maryland**, 373 U.S. 83, [87] (1963) [("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.")]. Specifically, the PCRA court found that Robinette had suppressed information regarding []

- 2 -

Commonwealth witnesses [Trubuiani and Wright], both of whom were incarcerated at the time of Appellant's jury trial and testified regarding "jail house" confessions by Appellant. The suppressed information related to efforts made by the Commonwealth to aid [Trubuiani and Wright's] release from incarceration.

Subsequently, the Pennsylvania Supreme Court remanded the matter to the PCRA court after finding that the PCRA court failed to engage in part of the ***Brady*** analysis, *i.e.*, whether the suppression of information that served as the basis of the ***Brady*** violation was material to the outcome of the case, *i.e.*, did Appellant receive a fair trial under the circumstances. ***See Commonwealth v. Weiss***, 986 A.2d 808 (Pa. 2009) (***Weiss II***)….

The PCRA court issued a decision on the remanded PCRA matters on March 19, 2012, where it agreed that the Commonwealth suppressed impeachment evidence in violation of the duties set forth in ***Brady***. However, the court concluded that Appellant was not entitled to a new trial, because the other evidence presented to the jury was overwhelming, and, therefore, the jury's verdict was worthy of every confidence. An appeal was taken from [this] decision, and on October 31, 2013, the Pennsylvania Supreme Court affirmed. ***See Commonwealth v. Weiss***, 81 A.3d 767 (Pa. 2013) (***Weiss III***).

Appellant then pursued federal *habeas corpus* relief pursuant to 28 U.S.C.A. § 2254 [(governing remedies in federal courts available to inmates in state prison)]. By an Opinion and Order dated February 14, 2018, the United States District Court granted [Appellant's] request for relief. ***See Weiss v. Wetzel***, 2018 U.S. Dist. LEXIS 23741[, 2018 WL 895689], at *44 (W.D. Pa. 2018) (***Weiss Fed***.).[3] The grant of the writ was conditional, in that it was stayed to permit the Commonwealth the opportunity to commence a new trial. [***Id.***] at *53. The matter was returned to th[e] state trial court to conduct the new trial.

[3] The Court in ***Weiss Fed***. held that Robinette's misconduct deprived Appellant of a fair trial, where Robinette suppressed impeachment evidence regarding … [Trubuiani and Wright]. ***See*** 2018 U.S.

> Dist. LEXIS 23741 at *51 (stating that where "prosecutors do secret deals, suppress evidence of them, stand by silently when the witnesses they determine to be central to their case lie about those deals, and then cover their tracks with their own false statements in and to a trial court, all in a way that plainly impacts the course and outcome of the trial, both those charged with crimes and the public are deprived of the fair trial that our Constitution commands").

> Counsel for Appellant thereafter filed [on December 12, 2018, the instant motion to dismiss charges against Appellant based on double jeopardy grounds (Jeopardy Motion).] [T]he [trial] court scheduled and held a hearing pursuant to Pa.R.Crim.P. 587(B) (governing motions to dismiss on double jeopardy grounds) on January 15, 2019. The Commonwealth presented the testimony of Robinette; no other testimony was presented.

> * * *

Trial Court Opinion and Order, 8/1/19, at 3-13 (footnote[] … added, citations and formatting modified, some capitalization omitted).

By order entered August 1, 2019, the trial court denied Appellant's Jeopardy Motion. [**See** Opinion and Order, 8/1/19, at 31 (concluding although "Robinette's failures and the resulting deprivation of due process were born out of arrogance and ignorance, … Robinette's conduct was not intentionally undertaken to deprive [Appellant] of a fair trial"; thus, dismissal based on double jeopardy was unwarranted).] Appellant then filed a petition for permission to file an interlocutory appeal, which the trial court granted after finding that the matter was immediately appealable.

**Commonwealth v. Weiss**, 240 A.3d 185 (Pa. Super. 2020) (**Weiss IV**)

(unpublished memorandum at 1-3, 8) (footnote in original; citations modified;

some brackets and ellipses omitted).

- 4 -

This Court in **Weiss IV** "vacate[d] the trial court's order denying the Jeopardy Motion and remand[ed] for further proceedings as to whether Robinette's conduct was undertaken recklessly," **id.** (unpublished memorandum at 12), pursuant to our Supreme Court's then-recent decision in **Commonwealth v. Johnson**, 231 A.3d 807, 826 (Pa. 2020)[1] (holding reckless as well as intentional conduct can be grounds for dismissal, and stating: "Under Article I, Section 10 of the Pennsylvania Constitution, prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result."). We stated:

> [T]he trial court, acting as factfinder, found insufficient evidence to establish that Robinette acted **intentionally** in failing to disclose his communications with Wright and Tribuiani. … However, the court did not consider or address whether Robinette's actions constituted **reckless** behavior, pursuant to the recent dictates of **Johnson**.

**Weiss IV** (unpublished memorandum at 11-12) (emphasis in original). We instructed the trial court to consider whether **Johnson** was applicable. **Id.** (unpublished memorandum at 1, 12).

---

[1] We observed that "**Johnson** … was decided after Appellant filed the underlying appeal," and "expanded upon existing case law concerning prosecutorial misconduct sufficient to bar retrial." **Weiss IV** (unpublished memorandum at 11); **see also In re Tr. of Scaife**, 276 A.3d 776, 793 (Pa. Super. 2022) ("Normally, we apply a new decision to cases pending on appeal at the time of the decision." (citation omitted)).

On remand, the trial court considered the parties' respective memoranda and held three status conferences; no additional evidence was adduced.[2] On June 10, 2021, the trial court issued an order denying the Jeopardy Motion, accompanied by a comprehensive, 42-page opinion.

Appellant filed a notice appeal from the June 10, 2021, order on March 8, 2022.[3] On March 9, 2022, the trial court directed Appellant to file within

_____

[2] Appellant did not re-file a motion to dismiss on double jeopardy grounds, and relied on his prior Jeopardy Motion. On May 3, 2021, Appellant filed a brief in support of the Jeopardy Motion.

[3] Appellant's notice of appeal was facially untimely. **See** Pa.R.A.P. 903(a) (appeals must "be filed within 30 days after the entry of the order from which the appeal is taken."); **see also Commonwealth v. Gross**, 232 A.3d 819, 830 (Pa. Super. 2020) (*en banc*) ("Pre-trial orders denying double jeopardy claims are immediately appealable in the absence of a written finding of frivolousness by the hearing court.") (citation omitted). However, there was a breakdown because the trial court failed to comply with Pa.R.Crim.P. 587(b) (procedure for motions to dismiss on double jeopardy). The Rule states:

> **(4)** In a case in which the judge denies the motion, the findings of fact shall include a specific finding as to frivolousness.
>
> **(5)** If the judge makes a finding that the motion is frivolous, the judge shall advise the defendant on the record that a defendant has a right to file a petition for review of that determination pursuant to Pa.R.A.P. 1311(a)(3) within 30 days of the order denying the motion.
>
> **(6)** If the judge denies the motion but does not find it frivolous, the judge shall advise the defendant on the record that the denial is immediately appealable as a collateral order.

Pa.R.Crim.P. 587(b)(4)-(6). The June 10, 2021, order did not contain a finding as to frivolity or advise Appellant of his appeal rights pursuant to Rule 587(b). **Cf. Commonwealth v. Sanchez**, 262 A.3d 1283, 1284 n.1 (Pa.
*(Footnote Continued Next Page)*

- 6 -

21 days a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b).[4] Appellant timely filed a concise statement (Concise Statement). On March 18, 2022, the trial court issued an order adopting the reasoning in its June 10, 2021, opinion and order.

Appellant presents two issues for our review:

[1.] Where Appellant's conviction was previously vacated after he "was denied a fair trial because the Commonwealth materially corrupted the truth-seeking function of the trial by knowingly presenting or failing to correct perjured testimony," and the lower court here concluded that the trial prosecutor's "serious prosecutorial error" included "reckless conduct," does Pennsylvania law bar retrial?

[2.] Where the federal court found that the trial prosecutor "knowingly" made "secret deals," personally denied the existence of those deals to the trial court in what "was plainly a lie," failed to correct testimony that he knew to be "deliberately misleading" and "demonstrably false," and committed this misconduct "all in a way that plainly impact[ed] the course and outcome of trial," was the lower court at liberty to deny relief by making contradictory findings and otherwise failing to apply the findings of the federal court?

Appellant's Brief at 9-10.

Appellant first claims the trial court erred in denying his Jeopardy Motion following remand, and in determining that **Johnson** was distinguishable. **See id.** at 26-27, 32-34. According to Appellant, "Robinette's misconduct was

_____

Super. 2021) (trial court complied with Rule 587(b)(6)). Accordingly, we exercise jurisdiction.

[4] The trial court cautioned that "any issue not properly included in the statement timely filed and served pursuant to Rule 1925(b) … shall be deemed waived." Order, 3/9/22, ¶ 4.

more outrageous" than the conduct in ***Johnson***, ***id.*** at 33, and Robinette's "actions … were recklessly undertaken to prejudice [Appellant] to the point of the denial of a fair trial." ***Id.*** at 28; ***see also id.*** at 34 (claiming, "as in ***Johnson***, Robinette's tactics were 'strongly suggestive of a reckless disregard for consequences and for the very real possibility of harm stemming from the lack of thoroughness in preparing for a first-degree murder trial.'" (quoting ***Johnson***, 231 A.3d at 827)). Appellant asserts this Court "should hold the reckless misconduct denied Appellant a fair trial … and retrial should be barred as it violates the Double Jeopardy Clause of the Pennsylvania Constitution." ***Id.*** at 29.

Conversely, the Commonwealth claims the trial court correctly found ***Johnson*** distinguishable, and did not err in denying Appellant's Jeopardy Motion:

> [***Johnson***] held that reckless as well as intentional prosecutorial misconduct may be deemed egregious, but it did not relax the Court's long-established jurisprudence that only egregious overreaching, rather than ordinary misconduct, can bar retrial. The [trial] court [in this case] found that, although the prosecutor's decision-making at [Appellant's] original trial may have been flawed and erroneous, only one particular aspect of his conduct rose to the level of recklessness and the gravity of that conduct and its resulting impact on the trial were far less serious than the Commonwealth's conduct in ***Johnson***. [Appellant's] double jeopardy motion was therefore properly denied. The trial court should be affirmed and this case remanded for retrial.

Commonwealth Brief at 19.

We conduct review mindful of the following:

[A]n appeal grounded in double jeopardy raises a question of constitutional law. This [C]ourt's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*. To the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard of review to those findings:

Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

*Commonwealth v. Kearns*, 70 A.3d 881, 884 (Pa. Super. 2013) (citation omitted). Although our review is not "blindly deferential" to a trial court's credibility determinations, we recognize a "fact-finder who hears witness testimony first-hand is able to take into account not only the words that are spoken and transcribed, but the witnesses' demeanor, tone of voice, mannerisms, and the like." *Johnson*, 231 A.3d at 818 (citations omitted).

This Court has explained:

The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article 1, § 10 of the Pennsylvania Constitution protect a defendant from repeated criminal prosecutions for the same offense. Ordinarily, the law permits retrial when the defendant successfully moves for mistrial. If, however, the prosecution engages in certain forms of intentional misconduct, the Double Jeopardy Clause bars retrial. Article I, § 10, which our Supreme Court has construed more broadly than its federal counterpart, bars retrial not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. An error by a prosecutor does not deprive the

> defendant of a fair trial. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied.

***Commonwealth v. Byrd***, 209 A.3d 351, 353 (Pa. Super. 2019) (citation omitted). "Dismissal is an appropriate remedy in such a case because a mistrial would be an inadequate remedy for systematic intentional prosecutorial misconduct." ***Id.*** (citation omitted and formatting altered). "By and large, most forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial. Intentional prosecutorial misconduct, on the other hand, raises systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial." ***Id.*** (citation omitted). "[A] fair trial is not simply a lofty goal, it is a constitutional mandate, … and where that constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity." ***Id.*** (citation omitted).

***Commonwealth v. King***, 271 A.3d 437, 443-44 (Pa. Super. 2021).

"However, because of the compelling societal interest in prosecuting criminal defendants to conclusion, our Supreme Court has recognized that **dismissal of charges is an extreme sanction that should be imposed sparingly** and only in cases of blatant prosecutorial misconduct." ***Commonwealth v. Wilson***, 147 A.3d 7, 13 (Pa. Super. 2006) (emphasis added).

In ***Johnson***, our Supreme Court emphasized, "we do not suggest that all situations involving serious prosecutorial error implicate double jeopardy under the state Charter." ***Johnson***, 231 A.3d at 824.

> To the contrary, we bear in mind the countervailing societal interests … regarding the need for effective law enforcement, ***see generally State v. Michael J.***, 274 Conn. 321, 875 A.2d 510, 534 (Conn. 2005) (referring to the need for an "optimal balance between the defendant's double jeopardy rights and society's interest in enforcing its criminal laws"), and highlight again that, in accordance with long-established double-jeopardy precepts,

- 10 -

retrial is only precluded where there is prosecutorial **overreaching** - which, in turn, implies some sort of conscious act or omission.

*Johnson*, 231 A.3d at 826 (emphasis in original); *see also King*, 271 A.3d at 450 (summarizing: "In *Johnson*, the Commonwealth's failure to conduct even a cursory review of its evidence led to a non-existent piece of evidence to establish Johnson's guilt. This recklessness on the part of the Commonwealth in *Johnson* represented an instance of seeking a conviction at the expense of justice, and it rose to the level of overreaching." (citing *Johnson*, 231 A.3d at 824, 827)).

After careful consideration, we conclude that the trial court's opinion accompanying the June 10, 2021 order ably details Robinette's "undisputed" and pertinent conduct, and the evidence adduced at the January 15, 2019, evidentiary hearing on Appellant's Jeopardy Motion. *See* Trial Court Opinion, 6/10/21, at 7-15. As the record supports the trial court's narrative, we adopt and incorporate it here. *See id.*[5] Further, the trial court addressed the merits of Appellant's claim, the facts and holding of *Johnson*/related precedent, and

_____

[5] In sum, the trial court found Robinette incorrectly represented there were no "deals" or understandings between the Commonwealth and Tribuiani and Wright in exchange for their testimony. *See* Trial Court Opinion, 6/10/21, at 7-15. Robinette had written several letters on behalf of Tribuiani and Wright, both prior to and after Appellant's trial, pertaining to possible parole/early release, and favorably describing Tribuiani and Wright's assistance in the prosecution of Appellant's case. *See id.* Robinette sent letters to, *inter alia*, the Pennsylvania Board of Probation and Parole, Superintendents at State Correctional Institutions housing Tribuiani and Wright, and district attorneys and sentencing judges involved in Tribuiani and Wright's cases. *See id.*

properly concluded that ***Johnson*** is distinguishable. ***See*** Trial Court Opinion, 6/10/21, at 18-42.[6] The trial court capably addressed every facet of Appellant's claim, such that further commentary by this Court would be redundant. Accordingly, we adopt the analysis and conclusion as our own. ***See id.***

In addition, we deem controlling this Court's decision in ***Commonwealth v. Sanchez***, 262 A.3d 1283 (Pa. Super. 2021), which involved a defendant's appeal of the denial of a motion to dismiss based on double jeopardy. The defendant in ***Sanchez***

> claimed that even if the prosecution's actions in his case were unintentional, under ***Johnson***, the prosecution's reckless actions in failing to disclose the DNA results in his case deprived him of a fair trial such that retrying him would violate double jeopardy.

***Id.*** at 1288. This Court detailed the "reckless" conduct in ***Johnson***, ***see id.*** at 1291-92, and concluded:

> Notwithstanding the Commonwealth's unfortunate errors in this case, they do not rise to the level of recklessness displayed in ***Johnson***. On this record, we cannot agree with Appellant that the Commonwealth engaged in "prosecutorial overreaching" by acting "with a conscious disregard for a substantial risk" of depriving Appellant of a fair trial. ***Johnson***, 231 A.3d at 826. Under these facts, the remedy for the Commonwealth's actions is

---

[6] The trial court found "almost all of Robinette's conduct to be negligent, undertaken on the basis of a mistaken belief that had some basis in law and fact." Trial Court Opinion, 6/10/21, at 38. The court also found Robinette's "reckless decision did not carry with it a substantial risk that [Appellant] would be denied a fair trial." ***Id.*** at 39; ***see also id.*** (finding "Robinette was not in a position to promise leniency," and "[u]nlike ***Johnson***, the Commonwealth's recklessness does not deal with the key piece of physical evidence leading to [Appellant's] conviction." (footnote omitted)).

precisely what the court ordered here—a new trial. *See Kearns*, *supra*.

*Sanchez*, 262 A.3d at 1294 (footnote omitted; some citations modified). We further observed that *Johnson* "discuss[ed the] great deference afforded to trial courts regarding credibility determinations." *Id.*; *see also Johnson*, 231 A.3d at 818, *supra*. Thus, this Court stated: "we see no reason to disrupt the court's credibility determinations in favor of the Commonwealth, which are supported by the record." *Sanchez*, 262 A.3d at 1294. We also emphasized, "the only 'false evidence' on which [a]ppellant relies is distinguishable from that in *Johnson*." *Id.*

*Sanchez* is directly on-point, while *Johnson* is distinguishable. Therefore, Appellant's claim that the trial court erred in applying *Johnson* is without merit. We reiterate that the trial court capably addressed and distinguished *Johnson*. *See*, *e.g.*, Trial Court Opinion, 6/10/21, at 38 (finding "almost all of Robinette's conduct to be negligent"), *id.* at 39 ("Unlike *Johnson*, the Commonwealth's recklessness does not deal with the key piece of physical evidence leading to the defendant's conviction." (footnote omitted)), *id.* at 42 (finding, "the gravity of [Robinette's] reckless conduct, and the resulting impact said conduct had on the trial, is far less egregious than the Commonwealth's conduct in *Johnson*."), and *id.* (concluding "Robinette committed serious prosecutorial error, but when misconduct lacks the intentionality required, or constitutes reckless conduct without a substantial risk that the defendant will be denied a fair trial, Pennsylvania

jurisprudence provides that the prejudice caused to the defendant can be remedied by retrial.").

Instantly, like the Court in **Sanchez**, we conclude "the Commonwealth's unfortunate errors … do not rise to the level of recklessness displayed in **Johnson**[,]" **Sanchez**, 262 A.3d at 1294; therefore, "the remedy for the Commonwealth's actions is precisely what the court ordered here—a new trial." **Id.** (citing **Kearns**, **supra**); **see also King**, 271 A.3d at 450 (distinguishing **Johnson** and concluding "the prosecutor's [violation of **Brady** for failing to disclose to the defense a certain] … letter, although significant, does not constitute overreaching that would require the imposition of the double jeopardy bar precluding the retrial of this case," and holding that prosecutor's error "does not rise to the level of the 'almost unimaginable' error in **Johnson**"). Appellant's first issue does not warrant relief.

In his second issue, Appellant claims the trial court "further erred in failing to accept and give effect to the federal court's findings of fact and conclusions of law," *i.e.*, in **Weiss Fed**., **supra**. Appellant's Brief at 27; **see also id.** at 34-35 (arguing the "trial court made findings and conclusions that ignored or directly contradicted the federal court's ruling."). According to Appellant, "the federal court's findings and conclusions were binding on [the trial court] under Pennsylvania law, the law of the case, and the Supremacy Clause of the United States Constitution." **Id.** at 28; **see also id.** at 35-43.

The Commonwealth argues Appellant waived this claim for failure to preserve it in his Concise Statement. *See* Commonwealth Brief at 19-20, 41-42. The Commonwealth correctly observes Appellant "raised a United States Constitution Supremacy Clause, and only a Supremacy Clause, claim for the first time in paragraph 2 of his March 17, 2022 [Concise S]tatement." *Id.* at 42; *see also* Concise Statement, 3/17/22, ¶ 2 (claiming trial court's "disagreement" with the federal court's findings "violated the supremacy clause[.]").

Any claim that is not presented in a court-ordered concise statement results in waiver. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph [] are waived."); *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) (same); *see also* Pa.R.A.P. 302(a) (providing that issues not raised in the lower court are waived and cannot be raised for the first time on appeal). Thus, Appellant waived any claim not presented in his Concise Statement. *See Lord*; Concise Statement, 3/17/22, ¶ 2, *supra*.

We consider Appellant's claim to the extent it claims a violation of the Supremacy Clause of the United States Constitution.[7] Appellant's Brief at 41-43. Appellant argues the trial court was "duty-bound to respect the federal

_____

[7] "[T]he Supremacy Clause[] provides that the laws of the United States 'shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Dooner v. DiDonato*, 971 A.2d 1187, 1193 (Pa. 2009) (quoting U.S. Const. art. VI, cl. 2).

court judgment invalidating [Appellant's] conviction," *id.* at 42, and "was not at liberty to reach findings and conclusions contrary to the federal court's ruling…." *Id.* at 43.

The Commonwealth counters that the trial court did not violate the Supremacy Clause because the federal court in *Weiss Fed*. "did not bar retrial on double jeopardy grounds, and the issue of prosecutorial overreaching must therefore be addressed by the Courts of this Commonwealth under the law of this Commonwealth." Commonwealth Brief at 49; *see also id.* at 43 (stating, there "is no conflict between the [*Weiss Fed*.] decision based on federal law and the lower court's independent assessment of [Appellant's] claims").

Whether the trial court violated principles of preemption is a question of law. Therefore, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Sow*, 860 A.2d 154, 155 (Pa. Super. 2004).

Upon review, we agree with the Commonwealth. *See* Commonwealth Brief at 43, 49, *supra*. The federal court's grant of Appellant's writ of *habeas corpus* in *Weiss Fed*. was "conditional," and permitted the Commonwealth to "commence a new trial." *Weiss Fed*. at *53; *see also id.* at *52 (stating Appellant "was denied a fair trial," but "so too the citizens of the Commonwealth were denied the resolution of Ms. Bruzda's murder that a fair trial can deliver for them."). The trial court was not precluded from making factual findings and applying Pennsylvania law to the findings. Notably, this Court in *Weiss IV* directed the trial court to make factual findings. *Weiss*

***IV***, 240 A.3d 185 (unpublished memorandum at 1, 12). Consequently, Appellant's second issue does not merit relief.

For the above reasons, we affirm the order denying Appellant's Jeopardy Motion, and remand the case for retrial.

Order affirmed. Case remanded for retrial. Jurisdiction relinquished.

Judge McLaughlin joins the memorandum.

Judge Pellegrini files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/27/2023

Gregory Simatic, OAG
Taylor Johnson, Esquire

IN THE COURT OF COMMON PLEAS OF INDIANA COUNTY,
PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,           : Criminal Action – Law
                                        :
VS.                                     : No. 218 Crim. 1997
                                        :
RONALD LEE WEISS,                       :
            Defendant.                  :

2021 JUN 10 AM 10: 46
INDIANA COUNTY
PROTHONOTARY AND
CLERK OF COURTS

## ORDER OF COURT

AND NOW, this 10th day of June, 2021, this matter comes before

the Court on a remand from the Pennsylvania Superior Court following

Defendant's appeal from this Court's denial of the Motion to Dismiss

Case and Discharge Defendant on Double Jeopardy Grounds.  After

careful consideration, it is hereby ORDERED, ADJUDGED, AND DECREED

that the Motion to Dismiss Case and Discharge Defendant on Double

Jeopardy Grounds is DENIED.  This Order of Court is entered consistent

with the attached Opinion.

BY THE COURT:

_____
Thomas M. Bianco, J.

253

IN THE COURT OF COMMON PLEAS OF INDIANA COUNTY,
PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,  :  Criminal Action – Law
                               :
        VS.                    :  No. 218 Crim. 1997
                               :
RONALD LEE WEISS,              :
        Defendant.             :

## OPINION AND ORDER OF COURT

Bianco, J.

This matter comes before the Court on a remand from the

Pennsylvania Superior Court following Defendant's appeal from this

Court's denial of the Motion to Dismiss Case and Discharge Defendant

on Double Jeopardy Grounds filed on behalf of Defendant.  Specifically,

the Pennsylvania Superior Court stated in its Memorandum dated

August 21, 2020, "[a]fter careful review, we are compelled to vacate

the order and remand for consideration of the Pennsylvania Supreme

Court's recent decision in Commonwealth v. Johnson, 2020 LEXIS

2791, 40 EAP 2018 (May 19, 2020)." Commonwealth v. Weiss, 1504

WDA 2019, at page 1.  The Superior Court concluded by making it's

2021 JUN 10 AM 10: 45
INDIANA COUNTY
PROTHONOTARY AND
CLERK OF COURTS

1

252

charge clear, stating "we.......remand for further proceedings as to whether Robinette's conduct was undertaken recklessly." Commonwealth v. Weiss, 1504 WDA 2019, at page 10, citing Commonwealth v. Johnson, 2020 Pa. LEXIS 2791, at 39.

This Court held three status conferences with counsel, and at the direction of the Court, defense counsel and counsel for the Commonwealth each submitted a brief addressing the issues before the Court. For the reasons set forth below, the Court finds that the double jeopardy clauses of the United States Constitution and the Pennsylvania Constitution do not bar the retrial of Defendant.

## PROCEDURAL HISTORY / FACTS

As stated in this Court's Opinion dated April 4, 2019, and this Court's Opinion dated August 1, 2019, the Court will attempt to limit its recitation of the procedural history and facts to the events relevant to the issues before the Court.

## Procedural History

The Court begins by setting forth the following procedural history contained in the Court's April 4, 2019, Opinion, and restated in the Court's August 1, 2019, Opinion:

"Defendant, Ronald Lee Weiss (hereinafter "Weiss"), was convicted of first-degree murder following a jury trial held in July of 1997. The jury returned a verdict of death following the penalty phase.

Weiss pursued a direct appeal, and in 2001, the Supreme Court of Pennsylvania affirmed the judgment of sentence. See Commonwealth v. Weiss, 776 A.2d 958 (Pa. 2001). Weiss then pursued collateral relief pursuant to the Post Conviction Relief Act (hereinafter "PCRA"), 42 Pa.C.S.A. Section 9541, et seq., and in 2007, the PCRA Court granted Weiss a new trial. The basis for the relief was a finding that the Commonwealth committed a Brady violation, see Brady v. Maryland, 373 U.S. 83 (1963). Specifically, the PCRA Court found that the Commonwealth suppressed information regarding two Commonwealth witnesses, both of whom were incarcerated at the time of the jury trial and testified regarding "jail house" confessions by Weiss. The

3

suppressed information related to efforts made by the Commonwealth to aid the witnesses' release from incarceration.

Subsequently, the Pennsylvania Supreme Court remanded the matter to the PCRA court after finding that the PCRA court failed to engage in part of the Brady analysis, i.e., whether the suppression of information that served as the basis of the Brady violation was material to the outcome of the case, i.e., did Weiss receive a fair trial under the circumstances. Commonwealth v. Weiss, 986 A.2d 808 (Pa. 2009) (Weiss II). Following the remand, the Honorable Charles R. Alexander was assigned to complete the PCRA proceedings because the Honorable William L. Henry, who presided over the initial PCRA proceeding, had retired. Unfortunately, Judge Alexander passed away before deciding the pending PCRA matters. The Honorable John H. Foradora was assigned to conclude the PCRA proceedings.

Judge Foradora issued a decision on the remanded PCRA matters on March 19, 2012. He agreed with the findings of the prior PCRA court that the Commonwealth suppressed impeachment evidence in violation of the duties set forth in Brady. However, Judge Foradora

4

concluded that Weiss was not entitled to a new trial, because the other evidence presented to the jury was overwhelming, and, therefore, "the jury's verdict was worthy of every confidence." Commonwealth v. Weiss, 81 A.3d 767, 885-786 (Pa. 2013) (Weiss III). An appeal was taken from Judge Foradora's decision, and on October 31, 2013, the Pennsylvania Supreme Court affirmed. Weiss III, *supra*.

Weiss then pursued federal habeas corpus relief pursuant to 28 U.S.C. Section 2254, and by Opinion and Order dated February 14, 2018, the United States District Court granted Weiss' request for relief. Weiss v. Wetzel, et al., 2018 WL 895689 (W.D. Pa. 2018). The grant of the writ was conditional, in that it was stayed to permit the Commonwealth the opportunity to commence a new trial. The matter was returned to this state trial court to conduct the new trial.

Counsel for Weiss filed a document entitled "Motion to Dismiss Case and Defendant on Double Jeopardy Grounds," and the Court scheduled and held a hearing pursuant to Pa.R.Crim.P. 587 on January 15, 2019. The Commonwealth presented the testimony of John Scott Robinette (hereinafter "Robinette"); no other testimony was presented."

5

(Opinion and Order of Court dated April 4, 2019, pp. 2-5) and (Opinion and Order of Court dated August 1, 2019, pp. 2-5)."

By Opinion and Order of Court dated August 1, 2019, this Court denied Defendant's Motion to Dismiss Case and Discharge Defendant on Double Jeopardy Grounds. Defendant then requested permission to file an interlocutory appeal, which was granted. Defendant then filed a timely Notice of Appeal on September 27, 2019, and a Concise Statement of Matter Complained of on Appeal on October 15, 2019.

In considering Defendant's appeal, the Pennsylvania Superior Court began by noting that "an order denying a motion to dismiss on double jeopardy is technically interlocutory, [but] the order is appealable as of right." Commonwealth v. Weiss, 1504 WDA 2019, at p. 1, fn 1, (additional citations omitted). And then as stated in the prologue above, the Pennsylvania Superior Court remanded the matter to this Court, stating "we vacate the trial court's order denying the Jeopardy Motion and remand for further proceedings as to whether Robinette's conduct was undertaken recklessly." Weiss at page 10, citing Commonwealth v. Johnson, 2020 Pa. LEXIS 2791, at 39.

6

## Facts

With regard to the relevant facts, once again, the Court believes that it is appropriate to restate the facts set forth in the Court's Opinion dated August 1, 2019, as follows:

"It is undisputed that the Commonwealth engaged in the following conduct:

1. Trooper John Tamewitz (hereinafter "Tamewitz") obtained a written statement from Samuel Tribuiani (hereinafter "Tribuiani") on April 2, 1996. The written statement indicated that Weiss confessed to the Bruzda murder while the two individuals were incarcerated together. The written statement also indicates that no promises were made in exchange for Tribuiani's testimony.

2. The following day, Tribuiani contacted Tamewitz and requested his assistance in expediting his parole. Tribuiani was incarcerated at S.C.I. Huntingdon at that time.

3. Tamewitz contacted Paul Strickland and Michael Marino, the District Attorney of Montgomery County, to inquire about Tribuiani's parole and early release status.

7

4. Robinette authored a memorandum on April 8, 1996, indicating that he had a conversation with "S.D.A.G. von Geis," and that he intended to contact the Superintendent at S.C.I. Huntingdon to inquire about expediting Tribuiani's parole.

5. Robinette did, in fact, call the Superintendent at S.C.I. Huntingdon and inquired if Tribuiani was eligible for parole or pre-release.

6. Shortly after preparing the memorandum of April 9, 1996, Robinette authored three letters regarding Tribuiani. The letters were written to Tribuiani's sentencing judge, the Victim-Witness Coordinator of Montgomery County, and the District Attorney of Montgomery County. These individuals would have the opportunity to provide input to the Pennsylvania Board of Probation and Parole regarding Tribuiani's release on parole. The letters request that the recipient "please consider Tribuiani's valuable cooperation with this office when and if you register any response to the Department of Corrections'

8

proposal for early release from his sentence." Tribuiani was blind copied on these letters.

7. Robinette followed his letter to Michael Marino, the District Attorney of Montgomery County, with a phone call to DA Marino.

8. The Court notes at this time that Tribuiani was released through the early release program on July 5, 1996, however, he was placed back into a state correctional institution in June of 1997 due to violations of his release conditions. Tribuiani continued to contact Tamewitz and Robinette to request their assistance in getting him out of prison.

9. Kermeth Wright (hereinafter "Wright") signed a statement indicating that Weiss had confessed to committing the Bruzda murder while the two were incarcerated together. This statement was signed in January of 1996.

10. On December 13, 1996, Robinette wrote a letter to Nicholas Muller, the Chairman of the Pennsylvania Board of Probation and Parole. Robinette stated "This Office has promised nothing to

9

Mr. Wright in exchange for his cooperation. I have explained to him that parole authority in his case rests exclusively with the Board of Probation and Parole. I am writing this letter merely to inform the Board of Mr. Wright's cooperation in the investigation and potential prosecution of a very serious crime." The letter was carbon copied to Tamewitz and blind copied to Wright.

11. Robinette failed to disclose to defense counsel or to the Court that Wright pled guilty to lying to an employee while in state prison. The plea was entered on April 14, 1997, approximately two months prior to the Weiss jury trial.

12. A pretrial motion hearing was held on May 16, 1997. The Court granted the motion entitled "Motion for Disclosure of Impeachment Information as to Potential Commonwealth Witnesses." As a result, the Commonwealth was ordered to notify the defense of "any deals or understandings made between the Commonwealth and potential witnesses, Tribuiani and Wright." In response to a direct inquiry by the Court on this matter, Robinette stated "Deals, we don't have any deals with

10

them, Judge." The Court then stated "the motion is granted and the answer is that there are no deals or consideration."

13. Later in the pretrial motion hearing of May 16, 1997, Robinette stated "I would just like to make on the record we have made no threats or promises and the only representation that we have made to these witnesses is that we will honestly report the level and extent of their cooperation and tell the truth about what they do and that is one part of it and we will take reasonable steps to protect their safety and those are the only representations that we have ever made to those witnesses."

14. Following a pretrial motion hearing, on May 20, 1997, Robinette authored and presented a letter to defense counsel stating that the Commonwealth will only report the nature and extent of the witnesses' cooperation whenever queried regarding the same. Robinette obviously had already written multiple letters on behalf of Tribuiani and Wright at the time this letter was submitted.

11

15. Robinette authored a letter dated July 1, 1997, to Raymond J. Sobina, Superintendent of S.C.I. Somerset. The letter identifies Wright as a "cooperating Commonwealth witness," and under the guise of "protecting the physical safety of Kermeth Wright," requests his transfer from SCI-Somerset, stating that "Mr. Wright has expressed a preference for SCI-Laurel Highlands."

16. At the time of trial, the Commonwealth called Wright as a witness. Robinette specifically asked Wright "Has anyone made you any promises in exchange for your testimony?" Wright responded "No, sir." On cross-examination, defense counsel asked Wright "So they did something in exchange for the statement, didn't they?" Robinette immediately objected and the objection was sustained by the Court. On re-direct, Robinette asked Wright if he "ask[ed] for anything in exchange for that statement." Wright responded "No, I did not."

17. The Commonwealth also called Trooper Jeffrey Witmer of the Pennsylvania State Police as a witness. Robinette asked Trooper Witmer if Wright asked for anything in exchange for his

12

cooperation. Witmer responded by stating that Wright made no requests.

18.     The Commonwealth called Tribuiani as a witness at the time of trial. During his testimony, Tribuiani stated that no one had made any promises to him in exchange for his testimony. This statement was made in response to Robinette's questioning.

19.     Robinette also called Tamewitz as a witness. In response to questioning by Robinette, Tamewitz stated that nothing was promised to Tribuiani in exchange for his testimony.

20.     After the conclusion of the trial, Robinette authored a letter to William F. Ward, Chairman of the Pennsylvania Board of Probation and Parole. This letter is dated July 17, 1997. Robinette requests that the "Board consider Mr. Tribuiani's contribution to this most unusual prosecution when evaluating the propriety of granting him parole."

21.     Robinette received a letter from Tribuiani dated August 2, 1997. Tribuiani wrote the letter to Robinette to thank him "for

13

all you are trying to or will try to do to expedite either my release to a half way house again and/or parole."

22. Robinette authored a letter to Donald Vaughn, Superintendent of SCI Graterford. The letter is dated September 15, 1997. In this letter, Robinette requests Mr. Vaughn to "consider Mr. Tribuiani's cooperation with this office when commenting of the propriety of his parole."

23. While not conduct attributable to the Commonwealth, the Court notes that Tribuiani subsequently wrote a letter to Robinette complaining that he wasn't paroled yet. In this letter, Tribuiani makes reference to a secret agreement for leniency between Robinette, Tamewitz, and Tribuiani. Tribuiani states that he was promised a release from incarceration after the conclusion of the trial.

24. Robinette also wrote a letter to the Pennsylvania Board of Probation and Parole on behalf of Wright after the trial. This letter was dated July 18, 1997. Robinette informed the Board of Wright's assistance in the conviction of Weiss, and then

14

requested that the Board "consider Mr. Wright's contribution to this most unusual prosecution when evaluating the propriety of granting him parole."

## DISCUSSION

The Pennsylvania Supreme Court, in <u>Commonwealth v. Johnson</u> broadened the jeopardy relief standard, stating as follows:

"Under Article 1, Section 10 of the Pennsylvania Constitution, prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result. This of course, is in addition to the behavior described in <u>Smith</u>, relating to tactics specifically designed to provoke a mistrial or deny the defendant a fair trial."

<u>Commonwealth v. Johnson</u> at 826.

15

*Commonwealth v. Johnson*, 231 A. 3d 807 (2020)

Since the Johnson Court expanded the double jeopardy relief standard, this Court finds it appropriate to restate the analysis contained in its Opinion dated August 1, 2019, and then supplement that analysis based on the Johnson expansion. The following was set forth in the Court's prior Opinion:

"The Court must now decide whether the double jeopardy clauses, as set forth in the Fifth Amendment to the United States Constitution and Article 1, Section 10 of the Pennsylvania Constitution, prohibit the retrial of Weiss. In the recent and germane case of Commonwealth v. Washington, 198 A.3d 381 (Pa.Super. 2018), the Pennsylvania Superior Court set forth the legal standards that the Court must follow in making this critical decision, stating as follows:

'The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article 1, Section 10 of the Pennsylvania Constitution prohibit retrial where prosecutorial misconduct during trial provokes a criminal defendant into moving

16

for a mistrial. See Oregon v. Kennedy, 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); Commonwealth v. Simons, 514 Pa. 10, 522 A.2d 537, 540 (1987). However, Article 1, Section 10 of the Pennsylvania Constitution offers broader protection than its federal counterpart 'in that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, **but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.**' Commonwealth v. Smith, 532 Pa. 177, 615 A.2d 321, 325 (1992). Pennsylvania has adopted a strict remedy for **intentional prosecutorial misconduct:** '[U]nder Pennsylvania jurisprudence, it is the **intentionality** behind the Commonwealth's subversion of the court process, not the prejudice caused to the defendant, that is inadequately remedied by appellate review or retrial. By and large, most forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial. **Intentional**

17

prosecutorial misconduct, on the other hand, raises systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial.' Commonwealth v. Kearns, 70 A.3d 881, 884-885 (Pa.Super. 2013) (footnote and emphasis omitted).

Washington at 387, quoting Commonwealth v. Lynn, 192 A.3d 194, 199-200 (Pa.Super. 2018) (emphasis added by this Court).

The Washington Court then stated: "Because of the compelling societal interest in prosecuting criminal defendants to conclusion, our Supreme Court has recognized that dismissal of charges is an extreme sanction that should by imposed sparingly and only in cases of blatant prosecutorial misconduct." Id., quoting Commonwealth v. Wilson, 147 A.3d 7, 13, (Pa.Super. 2016) (citations omitted).

In this case, the state trial court, the Pennsylvania Supreme Court, and the Federal District Court have found that the Commonwealth's conduct deprived Weiss due process as guaranteed by the Fourteenth Amendment to the United States Constitution, i.e., the Commonwealth engaged in prosecutorial misconduct in violation of Brady v. Maryland, 373 U.S. 83 (1963). Therefore, in deciding whether the double

18

jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article 1, Section 10 of the Pennsylvania Constitution prohibit retrial, the Court must answer one straightforward yet challenging question: Did Weiss show that the prosecution's conduct, as set forth in paragraphs 1 through 24 above, was intentionally undertaken in an attempt to deprive Weiss of a fair trial? See Smith at 186, 615 A.2d at 325. See also Lynn at 200.

This Court believes that prosecutorial misconduct can be of such a nature that the intentionality of the conduct and the intention to prejudice the defendant is apparent. For example, in Smith, the prosecution not only failed to disclose the adhesive "lifters" used by Corporal Balshy during the autopsy to pull granular particles that resembled sand from between the victim's toes, it implied that Balshy fabricated his testimony, and even requested an investigation into the possibility of charging Balshy with perjury. This was done by the prosecution during the course of the jury trial, with knowledge of the defense's theory that the victim was killed at the shore at Cape May, New Jersey. Smith at 182, 615 A.2d at 323. The prosecution also

19

denied the existence of an agreement with a Commonwealth witness that in exchange for his testimony he would receive favorable treatment at his sentencing. Id.

The Pennsylvania Supreme Court summarized the misconduct by stating "[d]eliberate failure to disclose material exculpatory physical evidence during a capital trial, intentional suppression of the evidence while arguing in favor of the death sentence on direct appeal, and the investigation of Corporal Balshy's role in the production of the evidence rather than its own role in the suppression of evidence constitute prosecutorial misconduct such as violates all principles of justice and fairness embodied in the Pennsylvania Constitution's double jeopardy clause." Id. at 183, 615 A.2d at 324.

Another example of recognizable intentional conduct with an intention to prejudice the defendant is set forth in Commonwealth v. Daidone, 453 Pa.Super. 550, 684 A.2d 179 (1996). In Daidone, the prosecutor made "it appear that there [was] evidence of guilt which in fact [did] not exist." Id. at 559, 684 A.2d 184. "The prosecutor made side comments within the hearing of the jury, denigrated the trial

20

judge's rulings in open court, and constantly repeated questions to which objections had been sustained in order to make it appear that the trial court was not allowing the Commonwealth to present its entire case." Id.

Turning to the present case, the intentionality of Robinette's conduct is not easily determined. The Court turns to the testimony provided by Robinette at the hearing on Defendant's Motion to Dismiss held on January 15, 2019, in the context of the facts of record.

Tribuiani

Robinette stated that when the Pennsylvania State Police first identified Tribuiani as an individual with information about the Bruzda murder, one of the first things that Robinette asked Tamewitz was "is he willing to testify and does he want anything." (Transcript of Motion to Dismiss hearing (hereinafter "TMDH"), p. 15). Robinette was informed that "yes, he's willing to testify and no, he understands that there's nothing we can do for him, he doesn't want anything." (TMDH, pp. 15-16). However, after Tribuiani agreed to testify and after providing a written statement to Tamewitz, he asked for favors on his

21

behalf. (TMDH, p. 16). These requests led to the letters written and phone calls made by Robinette on behalf of Tribuiani detailed in paragraphs 3, 5, 6, 7, 20, and 22 above.

Robinette also authored a memorandum dated April 8, 1996; this is the memorandum referenced in paragraph 4 above. It appears that the writing was an internal memo to the file. In the memo, Robinette states that "Initially, Tribuiani requested nothing in exchange for his cooperation and testimony. He later contacted Trooper Tamewitz and requested that Tamewitz assist in expediting his parole from SCI Huntington [sic]." (TMDH, pp. 36–37). The memo concludes with the following statement: "I will contact the superintendent of SCI Huntingdon to inquire about the possibility of expediting the parole of Tribuiani." (TMDH, p. 37).

Wright

Robinette stated that when Wright first came to his attention, Wright didn't request anything and the Commonwealth didn't promise him anything in exchange for his cooperation. (TMDH, p. 12). Robinette then stated that he wasn't in a position to promise Wright

22

anything because Wright was already serving a state sentence. (TMDH, pp. 12-13). Robinette stated that he communicated this to Wright. (TMDH, p. 13). Robinette testified that he told Wright that he would do two things: "No 1, I would do whatever I could to try to keep him safe while he was incarcerated." (TMDH, p. 14). "And No. 2, I communicated to him that I would always communicate the exact nature and extent of his cooperation to anyone if I was asked to do it, which in other words, I told him I would tell people about what he was doing if I was asked to do that." Id. Wright subsequently made requests for help from the Commonwealth; these requests resulted in Robinette authoring the letters detailed in paragraphs 10, 15, and 24 above.

Representations to the Court and Defense Counsel

Despite the letters written and phone calls made on behalf of Tribuiani, the memorandum written to the prosecution file, and the letters written on behalf of Wright, Robinette remained steadfast in his representations to the Court and to defense counsel. These representations are contained in paragraphs 12, 13, and 14 above, and

23

include the following statements: "Deals, we don't have any deals with them, Judge," "I would just like to make on the record we have made no threats or promises and the only representation that we have made to these witnesses is that we will honestly report the level and extent of their cooperation and tell the truth about what they do and that is one part of it and we will take reasonable steps to protect their safety and those are the only representations that we have ever made to those witnesses," and "the Commonwealth will only report the nature and extent of the witnesses' cooperation whenever queried."

Trial Testimony

Once again, despite the letters written on behalf of Wright, Robinette called Wright as a witness in the trial, and asked him the following question: "Has anyone made you any promises in exchange for your testimony?" In direct response to that question, Wright stated "No, sir." (Transcript of Trial of July 8, 1997, p. 553). Robinette made no effort to address this response. On cross-examination, defense counsel asked Wright "So they did something in exchange for the statement, didn't they?" Robinette immediately objected, and the trial

24

judge sustained the objection. On re-direct, Robinette addressed this issue with Wright again, asking Wright if he asked "for anything in exchange for that statement." Wright responded "No, I did not." Id. at 544.

With regard to Tribuiani's trial testimony, and despite the letters written and the phone calls made on Tribuiani's behalf, Tribuiani was asked if any promises were made to him in exchange for his testimony. Tribuiani said "No," and Robinette did nothing to address this testimony. Defense counsel did not ask a question regarding promises in exchange for Tribuiani's testimony, however, the objection to a similar question posed to Wright had already been sustained.

The Court notes that Robinette attempted to bolster the testimony of Wright by asking Trooper Jeffrey Witmer if Wright had asked for anything in exchange for his testimony; Witmer stated that Wright made no requests. Id. at 547. Similarly, Tamewitz testified that no promises were made to Tribuiani in exchange for his testimony. Id. at 564.

25

<u>Robinette's testimony regarding intent</u>

At the hearing on the Motion to Dismiss, Robinette testified in detail regarding his efforts on behalf of Tribuiani and Wright. This testimony was provided in response to questions posed by Deputy Attorney General Gregory J. Simatic and defense counsel. During this questioning, Robinette was asked about his state of mind regarding his efforts, vis-à-vis the representations he made to the Court and defense counsel, and the testimony he elicited during the trial. The Court finds the following questions and answers particularly relevant:

Q:     Did you feel that writing the letters on behalf of Mr. Tribuiani were in keeping with your representation to the Court and defense counsel about what you would do in on his behalf?

A:     Absolutely.

(TMDH, pp. 17-18).

Q:     And was it your belief that that was in keeping with your earlier disclosure?

A:     Absolutely. Exactly what I told Judge Ruddock and what I told Mr. Dougherty our deal was.

26

(TMDH, p. 19).

Q: Attorney Robinette, can you maybe state with a little more specificity why you felt that your actions were keeping up with your obligations?

A: My understanding of a couple things, Judge, first of all, my understanding of what Brady required at that time did not include letters such as the ones that I had written. I have been involved some appellate litigation where there were Brady issues raised during that time frame. And I even remember cases that, I believe, were valid at the time that said material had just be fathered [sic] for cross examination isn't necessarily Brady material. Additionally, I think there's some caselaw that reports of cooperation on behalf of witnesses, not necessarily, not Brady material at that time. That was in my mind. I didn't think it was. If it would have been a statement of a witness that was inconsistent, I would have understood that to be Brady material and that would have been turned over. These weren't statements by the witnesses. These were my statements. They were in my correspondence file. I couldn't imagine they would have been used

27

to cross examine the defendant. Particularly, because I had advised the Court and defense counsel of what I was doing for these witnesses, that I would try to help keep them safe and that I would report exactly, you know, what it was that they were doing for us. So no, not only did I never make a decision to not turn over those letters, Judge, I never even considered turning over those letters. That never struck me as something that----that I would do, never even considered it.

(TMDH, pp. 20-21).

Q:    And maybe I'll move on to the issue of any potential false testimony that was allegedly elicited at trial. Did you elicit any testimony that you believe to be false?

A:    No.

(TMDH, p. 22).

Q:    So was it your intent throughout these proceedings to afford Mr. Weiss a fair trial:

A:    Yes.

Q:    Did you ever entertain any notion of doing anything other than that?

A:     No.

(TMDH, p. 28).

The Court finds Robinette's testimony to be credible in a critical regard; this Court believes that Robinette genuinely thinks that his actions did not and do not constitute prosecutorial misconduct. He didn't believe it at the time of the trial, and it appears that he is skeptical of the decisions of the PCRA court, the Pennsylvania Supreme Court, and the Federal District Court. The Court finds Robinette's convictions regarding his conduct to be extremely flawed and troubling, but not impossible to believe.

For example, it is possible that Robinette held the belief that since Tribuiani and Wright did not request favorable treatment and no promises were made to them in exchange for their testimony **at the time they first agreed to cooperate**, statements such as "Deals, we don't have any deals with them, Judge," and "we have made no threats or promises and the only representation that we have made to these witnesses is that we will honestly report the level and extent of their cooperation and tell the truth about what they do and that is one part

29

of it and we will take reasonable steps to protect their safety and those are the only representations that we have ever made to those witnesses," were true statements.

It also is possible that Robinette did not believe that he had to disclose the individual letters and phone calls, even when required to disclose all "consideration" given, since he provided the general parameters of what he agreed to do on behalf of Tribuiani and Wright. With regard to this matter, this Court does not ignore the conditional phrase "whenever queried regarding the same," contained within Robinette's written statement to defense counsel. It is clear that Robinette wrote the favorable letters and made the favorable phone calls without being "queried" by a third party about Wright's cooperation or Tribuiani's cooperation. Robinette was questioned about this issue at the hearing on the Motion to Dismiss as follows:

Q:    That's what the letter says. As far as for Mr. Tribuiani's pre-release, were you queried by anybody from Montgomery County as to write a letter or tell about cooperation?

Robinette responded as follows:

30

A:     I was asked by Mr. Tribuiani to help him contact the people who might have an opportunity to comment on his pre-release.  Query is a word that's being used as if to query, being synonymous with to ask and that's the way I was using the word.

(TMDH, pp. 62-63).

Once again, Robinette's reasoning and decision-making regarding this issue is seriously flawed, but not impossible to believe.

With regard to the testimony provided at trial, it appears that Robinette phrased his direct exam questions to Wright, Tribuiani, Tamewitz, and Trooper Witmer in such a way to require a response regarding promises made **in exchange for** the confession testimony. For example, Robinette's question to Wright was as follows: "Has anyone made you any promises in exchange for your testimony?"  Since Wright agreed to testify prior to requesting assistance, Robinette believed that the testimony was not in exchange for the assistance. Once again, this reasoning is erroneous and troubling, but it is possible to believe that Robinette did not intend to elicit perjured testimony.

31

With regard to the possible existence of a "secret deal," the Court finds that the only evidence of a secret deal is contained in a letter written from Tribuiani to Robinette subsequent to the trial. The letter makes reference to a secret deal for leniency. The Court gives no weight to this reference, as Robinette had no decision-making authority with regard to Tribuiani's criminal matters. In other words, Robinette was incapable of delivering leniency.

The Court gives weight to the fact that Robinette wrote letters to a judge, a district attorney, several state correctional institution superintendents, and two chairmen of the Pennsylvania Board of Probation and Parole. In other words, he certainly wasn't trying to hide intentional wrongdoing. To the contrary, such actions are more consistent with a prosecutor who possessed the unenviable pairing of arrogance and ignorance.

Finally, the Court agrees with the PCRA court and the Federal District Court that Robinette's conduct was outrageous, as such word is defined as "unacceptable." However, an individual's conduct can be

32

outrageous yet inadvertent, thereby lacking intentionality toward a specific result. The Court finds that to be the case here."

Double Jeopardy Analysis Subsequent to

*Commonwealth v. Johnson*, 231 A. 3d 807 (2020)

As stated above, the Pennsylvania Supreme Court, in Commonwealth v. Johnson broadened the jeopardy relief standard. Therefore, the Court now addresses whether Robinette's prosecutorial misconduct was "undertaken recklessly, that is, with a conscious disregard for a substantial risk that" Weiss would be denied a fair trial.

The Court begins by discussing the facts of Johnson, because the Supreme Court took much care in stressing that the details of the prosecutorial misconduct in each case are critical, stating "we do not suggest that all situations involving serious prosecutorial error implicate double jeopardy under the state Charter." Id. The High Court then stated "[t]o the contrary, we bear in mind the countervailing societal interest mentioned above regarding the need for effective law enforcement. Id., (citation omitted). Finally, Justice Dougherty penned

33

a Concurring Opinion for the purpose of "expressing [his] view that, although [the Supreme Court's] decision broadens the jeopardy relief standard requiring intentional prosecutorial misconduct to include reckless (conscious) prosecutorial disregard of a substantial risk the defendant will be denied a fair trial, the standard continues to be a stringent one that will be satisfied only in egregious cases. Id at 828 (Justice Dougherty, Concurring). Justice Dougherty went on to state the following: "I do not read our decision as suggesting dismissal of charges is warranted in every case of prosecutorial misconduct. In the face of a double jeopardy challenge, unless there is evidence to support a finding of deliberate and reckless prosecutorial disregard of a substantial risk the defendant will be denied a fair trial, the remedy should be less severe than dismissal. Where such evidentiary support is lacking, the appropriate remedy will normally include the award of a new trial." Id.

This Court believes it is critical to begin with the Pennsylvania Supreme Court's opening statement of the question presented in Johnson. The Supreme Court stated as follows: "The question

34

presented pertains to the scope of protection offered by the Pennsylvania Constitution's Double Jeopardy Clause. We consider whether that provision bars retrial **where the Commonwealth obtains a conviction based on false evidence and its misconduct,** while not undertaken with the intent to deny the defendant a fair trial, nevertheless stems from prosecutorial errors that rise substantially above ordinary negligence. Id at 810 (emphasis added).

In Johnson, the law enforcement and the prosecution committed an almost unimaginable evidentiary error. The reality of the situation was that there were two baseball caps, a black cap and a red cap. The black cap was worn by the victim at the time of the shooting. Id at 811. It was collected as evidence[1] and submitted to the crime lab for testing; the victim's blood was present on the brim of the cap. Id. The red cap, which was recovered at the scene approximately nine feet from the victim's body, was sent for testing after Appellant, Kareem

---

[1] The black cap was given to the police at the police station shortly after the shooting by Debbie Williams, a friend of the victim, Walter Smith.

35

Johnson, was identified as a suspect; Johnson's DNA was present on the sweatband of the red cap. Id at 810-811.

From that point forward, the Commonwealth proceeded with the completely erroneous position that there was only one cap recovered, the red cap. Id at 811-812. The Commonwealth compounded this erroneous position by taking the lab results from the black cap, i.e., the presence of the victim's blood on the brim, and attributing those findings to the lab findings of the lab results of testing on the red cap (in addition to the actual lab results of testing on the red cap). Id. As a result of this series of unthinkable errors, the prosecution began the trial by telling the jury that Johnson was wearing the red cap, and was so close to the victim at the time of the shooting, that the victim's blood was found on Johnson's red cap. Id.

The red baseball cap was the Commonwealth's "crucial piece of physical evidence," and the mistakes continued. Officer Trenwith testified that "when he recovered the red cap from the scene he saw drops of fresh blood underneath the cap's brim," and he went on to testify that "he had never seen a case in which blood had spattered the

36

distance from Smith's body to where the red cap was found at the scene." Id at 812. Further, the forensic scientist who performed the DNA testing testified that the victim's blood and Johnson's DNA "were both found on 'the hat.'" Id. Johnson never challenged the one hat presentation, and in the closing argument, the prosecution argument was built on the fallacy that the victim's blood was on the brim of the red cap. Id at 812-813. The jury convicted Johnson on all counts and imposed the death penalty. Id at 813.

Following Johnson's direct appeals, Johnson filed an amended Post Conviction Relief Act Petition; soon thereafter the Commonwealth's lamentable error was discovered as the result of an open records request. Id. After the discovery, the Commonwealth "**agreed that Appellant was entitled to a new trial**, and the court entered an order to that effect in April 2015." Id. (emphasis added).

Turning to the facts of this matter, the Court has detailed Robinette's conduct that has been adjudged to be prosecutorial misconduct. The Court points out at this time its belief that certain conduct can be found to be negligent, while other conduct can be

37

found to be reckless. After careful review, this Court finds almost all of Robinette's conduct to be negligent, undertaken on the basis of a mistaken belief that had some basis in law or in fact. However, the Court finds Robinette's conduct to be reckless with regard to the statement that he would convey the nature and extent of Wright's and Trubuiani's cooperation "**whenever queried regarding the same.**"

As stated above, when questioned about the fact that he wrote favorable letters or made favorable phone calls **at the request of the cooperating witness**, Robinette responded as follows:

A:     I was asked by Mr. Tribuiani to help him contact the people who might have an opportunity to comment on his pre-release. Query is a word that's being used as if to query, being synonymous with to ask and that's the way I was using the word.

(TMDH, pp. 62-63).

The Court finds that decisions made based upon this barely believable explanation were made with a conscious disregard to the result. Given this finding, the Court now must look at whether such reckless conduct created a substantial risk that the defendant would be

38

denied a fair trial. The Court begins by conducting its own analysis of this question.

Unlike <u>Johnson</u>, the Commonwealth's recklessness does not deal with the key piece of physical evidence leading to the defendant's conviction.[2] Rather, it deals with the failure to disclose the fact that Robinette made phone calls and wrote letters to report Wright's and Tribuiani's cooperation. Robinette was not in a position to promise leniency. He was not in a position to deliver on a deal for favorable treatment. He was conveying the facts of the cooperation to the ultimate decision makers. Robinette was reckless in his decision not to disclose the phone calls and letters, however, the Court finds that this reckless decision did not carry with it a substantial risk that Weiss would be denied a fair trial.

---

[2] The Court points out that the Supreme Court in Johnson did not have to wrestle with the question of whether or not the prosecutorial misconduct posed a substantial risk of depriving the defendant of a fair trial. In fact, the Supreme Court begins its Opinion by phrasing the question to be answered as "[w]e consider whether that provision bars retrial where the Commonwealth obtains a conviction based on false evidence and its misconduct...." <u>Johnson</u> at 810. Obviously, the fact that the conviction was based upon the misconduct was self-evident. That is not the case here.

Next, the Court sets forth its belief that the Pennsylvania Supreme Court has already answered this question. In <u>Weiss III</u>, the Supreme Court reached the following conclusion:

"After a careful review of the record and the PCRA court's conclusions, we agree with the court that the Commonwealth's evidence against Appellant, independent of the tainted trial testimony of Mr. Wright and Mr. Tribuiani, contained adequate evidence of Appellant's guilt that **there is no reasonable probability that if the Commonwealth had turned over the relevant impeachment evidence Appellant would not have been convicted.**"

<u>Weiss III</u> at 699, 81 A.3d at 788 (emphasis added).[3]

This Court completely understands that the United States District Court for the Western District of Pennsylvania, in addressing Weiss' amended federal petition for writ of habeas corpus, found that the Pennsylvania Supreme Court's conclusion set forth above "'was so lacking in justification that there was an error well understood and

---

[3] This Court points out that the Supreme Court reached this conclusion considering the totality of Robinette conduct, not just the conduct that this Court has found to be reckless.

40

comprehended in existing law beyond any possibility for fairminded disagreement.'" Weiss v. Wetzel, et al., at p. 32. And in making this finding, the Federal District Court stated several times that Weiss was denied a fair trial. Weiss v. Wetzel, et al., at p. 36. However, this Court does not believe that the same state court jurisprudence that concluded that Weiss "received a fair trial with a verdict worthy of confidence" should now conclude that double jeopardy protections and precepts bar retrial.[4]

## CONCLUSION

As stated in this Court's earlier Opinion, the Court holds a firm belief that Robinette's failures and the resulting depravation of due process were born out of arrogance and ignorance. The Court believes that Robinette's conduct was not intentionally undertaken to deprive Weiss of a fair trial. The Court does find that a portion of Robinette's conduct was reckless, as the conduct was undertaken consciously,

---

[4] The Court notes that it has conducted an extensive search for guidance on this issue, however, given the complex procedural history of this matter, the Court has been unable to find a situation in which the Pennsylvania Supreme Court found prosecutorial misconduct that did not undermine confidence in the verdict, followed by a grant of federal habeas corpus on essentially the same issue, and then a double jeopardy claim prior to the commencement of the new trial.

41

without regard to the consequences, and with a barely arguable basis.

However, the gravity of the reckless conduct, and the resulting impact said conduct had on the trial, is far less egregious than the Commonwealth's conduct in <u>Johnson</u>. Robinette committed serious prosecutorial error, but when misconduct lacks the intentionality required, or constitutes reckless conduct without a substantial risk that the defendant will be denied a fair trial, Pennsylvania jurisprudence provides that the prejudice caused to the defendant can be remedied by retrial. Defendant should be given a new trial. Therefore, Defendant's Motion to Dismiss Case and Discharge Defendant on Double Jeopardy Grounds is DENIED.

WHEREFORE, the Court enters the following Order of Court.

INDIANA COUNTY
PROTHONOTARY AND
CLERK OF COURTS
2021 JUN 10 AM 10:45

42